UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HOWARD RICHMOND

      Petitioner,

v.                            CASE NO. 8:12-cv-2655-T-23MAP

SECRETARY, Department of Corrections,

      Respondent.

_____/

## O R D E R

Howard Richmond applies for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1) and challenges the validity of his two state convictions for attempted first-degree murder.  Richmond alleges four grounds of ineffective assistance of trial counsel.  Numerous exhibits ("Respondent's Exhibit __") support the response. (Doc. 10)

## FACTS[1]

Richmond's wife admitted to an affair.  Richmond believed that the affair was with his best friend, Terry Ray.  Richmond went to Ray's house where he found Ray asleep and stabbed him three times in the neck.  Richmond chased Ray's girlfriend,

---

[1] This factual summary derives from Richmond's brief on direct appeal and the record. (Respondent's Exhibits 1, 2)

Dawn Jordan, into the front yard and stabbed her eleven times, including in the

chest, throat, face, shoulder, and back.  Both Ray and Jordan survived.

Richmond was arrested and charged with one count of armed burglary of a

dwelling and two counts of attempted first-degree murder.  A jury acquitted

Richmond of the burglary charge and convicted him of both counts of attempted

first-degree murder.  Richmond serves consecutive sentences of thirty years

imprisonment for each conviction.

## I.    <u>EXHAUSTION AND PROCEDURAL BAR</u>

**Ground One — sub-part (b) and Ground Four**

In sub-part (b) of ground one (Doc. 1, p. 9) Richmond contends that

"[c]ounsel's failure to investigate petitioner's competency and mental health issues

deprived petitioner of an involuntary intoxication defense, with temporary insanity,

to buttress the heat of passion defense."  In ground four Richmond contends that his

trial counsel rendered ineffective assistance by conceding without Richmond's

consent that Richmond intended to kill the victims.  The respondent argues (Doc. 10,

pp. 15, 23) that both claims of ineffective assistance of trial counsel are procedurally

barred because Richmond did not raise the claims in the state post-conviction court.

Richmond filed no reply.

Richmond raised each claim of ineffective assistance of counsel for the first

time in his brief on appeal of the denial of his Rule 3.850 motion.  (Respondent's

Exhibit 23)  The respondent correctly argues that both claims are procedurally

defaulted.  A firmly established and regularly followed procedural rule in Florida

provides that an appellate court will not consider a claim raised for the first time on

appeal.[2]  *See Connor v. State*, 979 So. 2d 852, 866 (Fla. 2007) ("This . . . issue was not

raised at the trial level and was not raised in the 3.851 motion.  Because the issue

may not be heard for the first time on appeal of a post-conviction motion, we deny

relief on this issue."); *Doyle v. State*, 526 So. 2d 909, 911 (Fla. 1988) (finding that,

because the defendant did not present a claim to the trial court in his Rule 3.850

motion, he could raise the claim for the first time on appeal of the order denying

relief).

 The state appellate court affirmed the denial of Richmond's Rule 3.850 motion

in a *per curiam* decision without a written opinion.  (Respondent's Exhibit 25)  When

a Florida court issues a summary denial on a procedurally barred claim and includes

no discussion of the merits of the federal claim, a federal court "cannot assume that

had the [state court] explained its reasoning, it would have reached the merits of [the]

claim." *Zeigler v. Crosby*, 345 F.3d 1300, 1310 (11th Cir. 2003) (citations omitted).

Richmond's failure to properly exhaust his ineffective assistance of counsel claims in

the state court results in a procedural default.

 Under the procedural default doctrine, "[i]f the [applicant] has failed to

exhaust state remedies that are no longer available, that failure is a procedural default

which will bar federal habeas relief, unless either the cause and prejudice or the

---

[2]  The state specifically asserted a procedural bar in its brief on the appeal of the denial of
Richmond's Rule 3.850 motion. (Respondent's Exhibit 24, p. 1)

fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).  To establish cause for a procedural default, an applicant "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999).  To show prejudice, an applicant must demonstrate not only that errors at the trial created the possibility of prejudice but that the errors worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimension.  *United States v. Frady*, 456 U.S. 152 (1982).  In other words, an applicant must show at least a reasonable probability of a different outcome.  *Henderson*, 353 F.3d at 892.

Without a showing of cause and prejudice, an applicant may obtain federal habeas review of a procedurally defaulted claim only if review is necessary to correct a fundamental miscarriage of justice.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986).  A fundamental miscarriage of justice occurs if a constitutional violation has probably resulted in the conviction of someone who is actually innocent.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson*, 353 F.3d at 892.  This exception requires an applicant's "actual innocence." *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001).  To meet the "fundamental miscarriage of justice" exception, Richmond must show constitutional error coupled with "new reliable evidence — whether exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence — that was not presented at trial."

*Schlup*, 513 U.S. at 324.

Richmond fails to demonstrate cause and prejudice excusing the default of both sub-part (b) of ground one and ground four.  *Carrier*, 477 U.S. at 495–96.

Richmond cannot meet the "fundamental miscarriage of justice" exception because he presents no "new reliable evidence" that he is actually innocent.  *Schlup*, 513 U.S. at 327.  Because Richmond satisfies neither exception to procedural default, both sub-part (b) of ground one and ground four are procedurally barred from federal review.

**Grounds Two and Three**

In ground two Richmond contends that his trial counsel rendered ineffective assistance by not investigating Richmond's wife and by not calling her as a witness at trial.  In ground three Richmond contends that his trial counsel rendered ineffective assistance by not cross-examining state witness Emmanuel Quinones.

The respondent correctly argues that both ground two and ground three are unexhausted and procedurally defaulted because, although he raised these grounds in his Rule 3.850 motion and was granted an evidentiary hearing, Richmond did not appeal the denial of the grounds.

Before a federal court can grant habeas relief, a federal habeas petitioner must exhaust every available state court remedy — either by direct appeal or by a state post-conviction motion — for challenging his conviction.  28 U.S.C. § 2254(b)(1)(A),

(C).  "[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citations omitted)).  To exhaust a claim, a petitioner must present the state court with the particular legal basis for relief in addition to the facts supporting the claim.  *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).  The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief.  *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

Richmond's failure to brief his ineffective assistance of counsel claims on appeal results in abandonment.  Fla. R. App. P. 9.141(b)(3)(C).  *See also Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir.1979) (stating that exhaustion of a claim raised in a Rule 3.850 motion includes an appeal from the denial of the motion); *Cunningham v. State*, 131 So. 3d 793, 794 (Fla. 2d DCA 2012) (explaining that an appeal of the denial of a Rule 3.850 motion requires briefing for a ground denied after

an evidentiary hearing); *Duest v. Dugger*, 555 So. 2d 849 (Fla. 1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived."). Consequently, grounds two and three of the federal application are unexhausted. Richmond cannot return to state court to file an untimely collateral appeal challenging the denial of grounds two and three. Fla. R. Crim. P. 3.850(k). Consequently, each ground is procedurally defaulted. Richmond fails to demonstrate cause and prejudice excusing the default. *Carrier*, 477 U.S. at 495–96. Richmond cannot meet the "fundamental miscarriage of justice" exception because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327. Because Richmond satisfies neither exception to procedural default, grounds two and three are procedurally barred from federal review.

## II.   <u>MERITS</u>

As determined above, sub-part (b) of ground one and grounds two through four are entitled to no federal review. Richmond's remaining claim of ineffective assistance of trial counsel (sub-part (a) of ground one) is exhausted and entitled to a review on the merits.

<u>STANDARD OF REVIEW</u>

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir.

1998), *cert. denied*, 531 U.S. 840 (2000).  Section 2254(d), which creates a highly

deferential standard for federal court review of a state court adjudication, states in

pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), the Supreme Court

interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied — the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 526 U.S. 86, 103 (2011). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which

demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

In a *per curiam* decision without a written opinion the state appellate court affirmed the denial of Richmond's Rule 3.850 motion to vacate. (Respondent's Exhibit 25)  The state appellate court's *per curiam* affirmance warrants deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied*, 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby*, 538 U.S. 906 (2003).  *See also Richter*, 131 S. Ct. at 784–85 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Review of the state court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, i.e., the record before the state court.

*Pinholster*, 131 S. Ct. at 1398.  Richmond bears the burden of overcoming by clear and convincing evidence a state court factual determination.  "[A] determination of a

factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001). The state court's rejection of Richmond's post-conviction claims warrants deference in this case.

## STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Richmond claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas [applicant]s can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

*Strickland* requires proof of both deficient performance and consequent prejudice.  *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  466 U.S. at 690.  *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690.

Richmond must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  466 U.S. at 691–92.  To meet this burden, Richmond must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. Richmond cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). *See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (confirming that counsel has no duty to raise a frivolous claim).

Under 28 U.S.C. § 2254(d) Richmond must prove that the state court's decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Sustaining a claim of ineffective assistance

of counsel is very difficult because "[t]he standards created by *Strickland* and §

2254(d) are both 'highly deferential,' and when the two apply in tandem, review is

'doubly' so." *Richter*, 526 U.S. at 105.  *See also Pinholster*, 131 S. Ct. at 1410 (An

applicant must overcome this "'doubly deferential' standard of *Strickland* and the

AEDPA."), and *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011)

("Double deference is doubly difficult for a[n] [applicant] to overcome, and it will be

a rare case in which an ineffective assistance of counsel claim that was denied on the

merits in state court is found to merit relief in a federal habeas proceeding.").

**Ground One — sub-part (a)**

Richmond contends that his trial counsel rendered ineffective assistance by not

investigating Richmond's competency to stand trial.  Richmond claims that "[f]rom

the outset, [he] repeatedly informed counsel that he did not understand what was

going on, . . . that he was and had been taking numerous prescription medications

which interfered with his ability to understand the nature and consequences of the

proceedings, [that] he requested counsel to speak with his family concerning his

psychological problems, and [that] he enlisted counsel's assistance in obtaining his

needed medications."[3]  (Doc. 1, p. 4)  Richmond alleges that an adequate

investigation would have shown that he suffered from a learning disability and as a

teenager was treated in a psychiatric hospital for "emotional distress, paranoia, and

---

[3]  Richmond alleges that both at the time of the crimes and at trial that he was taking a "cocktail" of medications including Temazapam, Paxil, Elavil, Xanax, Soma, Vicodin, and "other medications." (Doc. 1, p. 9)

emotional handicaps." (Doc. 1, p. 4)  Also, an investigation would have shown that on another occasion Richmond was shot by a sheriff's deputy, which resulted in physical injuries and post-traumatic stress disorder.  Richmond claims that counsel failed to discover that Richmond was prescribed Prozac, Vistaril, and Thorazine while housed in the county jail.  He further claims that both jail personnel and other inmates would have disclosed to counsel that Richmond was delusional and heard voices.  Finally, Richmond claims that victim Dawn Jordan informed counsel during her deposition that Richmond suffered from a "psychological disorder."  Richmond concludes that counsel's "failure to adequately investigate [Richmond]'s competence and mental health problems prejudiced [him] by depriving him of due process of law, [a] plausible and valid defense, the right to a competency determination, the right to present mental health experts to explain the effects of each prescribed drug, and to give an opinion as to the administ[ration] of certain medications at one time . . . ." (Doc. 1, p. 5)

The state post-conviction court granted Richmond an evidentiary hearing on this ground.  Richmond's trial counsel testified about his evaluation of Richmond's competency as follows (Respondent's Exhibit 22, transcript of the September 7, 2010 Rule 3.850 evidentiary hearing, pp. 10–23):

> Q:  Okay. And with regards to did you look into any mental health concerns? Did he present to you with any mental health concerns?
>
> A:  I had him checked. The way the process worked over there at the PD's office — at least back in 2004, and you know, it's changed over the years, but this process has predominantly

stayed the same — but I had him evaluated a number of times. Not once, but twice I sent people out from our office.

What we have are social workers. I think it was Nancy Hughes who doesn't work there anymore — but she's one of the best. And basically what happens is they go out and they have some — they can talk to the person and give you kind of a feel of whether or not they see anything there. Generally speaking, they evaluate people for drug treatment programs. But they also have a mental health component.

In my own personal dealings with him and in the reports I was getting from our social workers, he did not — he clearly was competent to stand trial and he didn't present to me an insanity defense. Whether or not there was a diminished capacity defense, was hard to say.

And it might require some larger explanation, but part of the problem was within all of my meetings with Mr. Richmond, he wasn't — he gave me one story of how things occurred. And this story wasn't meeting with the facts of the case. Because you have to understand it was an incident, as it turned out his wife had committed adultery and that's what precipitated all these events. But I couldn't get through that part. He wouldn't talk to me about it.

. . . .

And so the story he was giving me didn't present for itself a diminished capacity defense in terms of heat of passion. And if you want, we can get into that more. But all this began to come together the night before trial when I finally went to have, you know, another meeting with him at the jail.

Q:  Okay. Well let's take it way back.

A:  Yes, ma'am.

Q:  Were you aware — did you ever have occasion to review the jail records or see how Mr. Richmond is doing over at the Hillsborough County jail, whether he was presenting with some sort of peculiar activity, or whether he was acting depressed in any way to the sheriffs at the Hillsborough County jail? Did you ever have occasion to do that?

A:  I visited him monthly. I didn't — I had social workers see him. We were not presented with any evidence from the jail indicating that he was suffering — I mean being in jail was depressing in and of itself, but I mean to the point where it was clinical. And then the next step, even if he was depressed, does it meet the, you know, the issue of competency to stand trial.

Q:  Well, and let me take you there. He was never evaluated for competency?

A:  Yes, he was. I had Dr. —

Q:  He was evaluated for competency?

A:  Yes, ma'am. After the trial was completed, I had Dr. Carpenter do a confidential evaluation in an abundance of caution. The reason is, is because —

Q:  For competency?

A:  For both — for more than just —

Q:  Or for mitigation?

A:  For both — competency, mitigation, insanity. I wanted the whole gamut. It was confidential though. And Dr. Carpenter's report came back with nothing.[4]

---

[4]  Counsel acknowledged at the sentencing hearing that he decided after the trial to have Dr. Carpenter evaluate Richmond (Respondent's Exhibit 1, Vol,. I, pp. 20–21):

> It was on the basis of my lengthy conversations with family members both before trial and then after trial that, you know, I made a decision post-trial to employ Dr. Carpenter to evaluate some things. I started having some concerns. In an abundance of caution I had Dr. Carpenter evaluate Mr. Richmond. I can proffer to the Court because I have spoken to Dr. Carpenter at length, and I'll simply proffer to the Court that Dr. Carpenter will not report anything that will create a legal issue.  His report will be offered in terms of just mitigation in terms of sentencing. We are not offering that there is a diminished capacity or anything that would create an appellate issue or something along the lines that maybe should have been offered at trial.

Dr. Carpenter testified at Richmond's sentencing hearing that he evaluated Richmond based on a post-trial personal interview with Richmond, psychiatric and clinic records from the jail, an

(continued...)

Q:  And I understand you had that done. Tell me when you had that done?

A:  I had it done after the jury trial, but before sentencing. I was looking to try and find a mitigation case.

Q:  And you say he was evaluated for all three things. But I — what benefit would that have had for [you] to evaluate Mr. Richmond for competency —

A:  You're —

Q:   — after a jury comes back?

A:  You're right. And see that's where this — the facts of this are interesting, and that's why I'm glad I did a memorandum for record. Mr. Richmond gave me a story of what occurred. And his story was one of self-defense. That is, that there was never an issue with his wife. That he had gone to the — he was at this place where the incident occurred and he was attacked by four people and that he acted in self-defense. And that was his case. It was a case of I'm perfectly okay, I'm a normal guy. I was attacked by these people and I acted in self-defense.

And every time that I tried to broach the issue of his wife's fidelity — because as I'm investigating the case, I'm getting evidence too — he would stop me. I was never allowed to talk with him about it. He would cut off the conversation. He would tell me not to talk to him about that. And I could never get to that point. His defense — and he insisted on his defense — was self-defense.

Self-defense doesn't necessarily lend itself to a sanity defense, nor does it lend itself to a diminished capacity defense in terms of heat of passion. And that's where Dr. Carpenter would've come in [and] done — and maybe had some value.

---

[4](...continued)
interview with a social worker from the public defender's office who had visited Richmond, and Richmond's mother's description to counsel of Richmond's psychiatric history. (Vol. I, p. 33) Dr. Carpenter opined that Richmond suffered from depression "leading up to the event . . . [a]nd since the event he's quite depressed again." (Vol. I, p. 34) Dr. Carpenter testified that he could "infer from what happened" that Richmond was in a state of "extreme emotional disturbance" at the time of the crime. (Vol. I, p. 36) Dr. Carpenter offered no testimony about Richmond's competence.

Because it was the night before trial, and I finally went to him and we just had a knock out drag out. I just basically laid it out to him. And you understand how it can get between defense counsel and client. It wasn't a pretty conversation. He finally started telling me what occurred with the wife's infidelity and everything along that line. It was at that point that I changed course and decided to go with the heat of passion defense, which was partially successful.

. . . .

And just one more point. I didn't mean to interrupt you, but this is important. Dr. Carpenter's report was completely unhelpful. So had Dr. Carpenter — had I — so let's say that I'd gone — I went to Judge Fleischer and I asked for a continuance in order to do an evaluation, which I don't think Judge — I know Judge Fleischer was not going to grant — it would not have mattered because Dr. Carpenter's report was not helpful at all as to the issue of diminished capacity for heat of passion.

Q:  When did you hire Dr. Carpenter? Did you hire him before the jury was picked on this case?

A:  No, ma'am. I hired him after the trial was completed.

Q:  So basically your opinion, that is more of a hindsight because Dr. Carpenter never got to see Mr. Richmond until after that jury came back with guilty of first degree attempted murder?

A:  That's correct.

Q:  Now you indicated you had people that went over to evaluate him. Do you remember — to take a look at him from social services in your office?

A:  That's correct.

. . . .

Q:  Do you know — let me ask you this. Do you know what [the social worker]'s credentials are?

A:  Miss Hughes — I don't know her credentials. I know that she's a social worker and I know that she deals with issues involving not just drug treatment programs but dual diagnosis

issues. You know, being able to determine whether or not a person would meet a dual diagnosis program, which gets into the mental health component. They are a good indicator of whether or not they think that you should take the next step and spend tax dollars to hire a someone like Dr. Carpenter to go do a confidential evaluation.

Q:  Let me ask you this, in your work as an Assistant Public Defender have you ever had occasion, or as a defense attorney, have you ever had occasion to request that a client, maybe on arraignment or a dispo date, be evaluated for competency?

A:  Absolutely. Many times.

Q:  And the court appoint[s] two doctors to take a look at that individual?

A:  That's right. Many times.

Q:  Okay. And that — and you're not telling me that you take — before you have that competent — before you ask the court to engage in that kind of evaluation on a defendant that's pending charges, do you take into account the taxpayer money that is going to cost the state of Florida?

A:  Now, Miss Vasquez, you're missing it. The issue was not competency. Even when I hired Dr. Carpenter, the issue for me was never competency. The man was competent to stand trial. The issue for me was whether or not — because the defense became heat of passion — remember, up until the day before trial, Mr. Richmond's position was that it was self-defense. It wasn't until the night before trial that Mr. Richmond finally opened up to me and became truthful as to what occurred.

And the defense was effective to the extent that he was found not guilty of the armed burglary of a dwelling, which was the most serious of the charges. That was the punishable by life felony.

The issue as to Dr. Carpenter, if I would've engaged him, would've never been competency or for sanity. That was not the issue. The issue would've been is I would've hired him confidentially to potentially testify as an expert on the issue and not knowing whether I could get it in, mind you, because diminished capacity is not recognized as a defense in the state of Florida.

- 20 -

Q:  Uh-huh, (affirmative).

A:  And I've tried it before, not successfully. But the issue for me would've been could I engage Dr. Carpenter to look at him for purposes of whether or not there would've been a diminished capacity which would've explained why he did this for purposes of heat of passion. And that's why I did it as an abundance of caution because what I was prepared to do at sentencing was then to lay that out for Judge Fleischer on a motion to ask for a new trial.

And here's — that's the critical issue because I see it the way you're seeing it. Should I have done this before trial? Dr. Carpenter was engaged, his report came back, it was not helpful. I had nothing.

Q:  Let me ask you, what information, if any — we're talking about Dr. Carpenter — what information did, other than interviewing the defendant — what other information was given to Dr. Carpenter to use during the course of his evaluation of Mr. Richmond? Were his medical records given to him?

A:  I would've expected him to look at all that. I can't answer your question affirmatively. I don't know what we did. I'd have to look at the documents.

Q:  Now, —

A:  I know that as a matter of course what our office will do is we'll send them the police report. He obviously knew what the verdict was. And I think Dr. Carpenter, as all these guys do when they go to the jail, they do review, you know, the jail medical records and things along that line before they interview the client.

Q:  And let me ask you this, were you aware of the psychotropic medication that Mr. Richmond was taking at the Orient Road jail — at the Faulkenburg jail?

A:  Are you asking me if I'm aware today or was I aware then? I would've been — it would've seemed to me that I would've been aware of that through the social workers because they would report that back. Generally, that's what they do is they in their report back, they'll give you a background with his educational history and psychological background history.

Whether or not he's ever had any meetings with psychologists. And there would be a history there. So the answer would be is if he was on psychotropic medication, I would've been aware of that.

Q:  Do you have any — today, do you have any independent recollection of that?

A:  No, I don't.

Q:  Did you have a — do you have any independent recollection of speaking to Mr. Richmond's family, his mother, talking about his mental health history that Mr. Richmond had suffered?

A:  Yes. I did speak to his family. His family did express to me — and this was before trial — concerns about his mental health. I think it was his mother I spoke to. I did speak to his wife. So yes, I was aware.

The family had — I was aware of that before trial, the family's concerns. I think that's why — and just to give you an order. I think because the family had called me, that's why I had sent our social workers out.

Q:  Let me ask you, in reviewing some of your letter that you wrote to your file and in reviewing the file, you were aware of an incident that occurred in Mr. Richmond's life in 1998 that he was the victim of a shooting?

A:  Yes, ma'am, that's correct.

Q:  And did you —  how much did you get into that with regards to everything that transpired between that shooting in 1998, which my understanding was very publicized in Hillsborough County because it was a shooting with a — by a law enforcement officer —

A:  That's right.

Q:   — to the 2005 incident that brought him to the courthouse to address these crimes that he was charged with?

A:  I gave that a great deal of thought. That weighed —

. . . .

Q:  And how? And you gave that a great deal of thought. Tell me what you did?

A:  That issue was very dangerous grounds. Understand that it was — our argument's self-defense up until the day before trial. And of course, the State was prepared to rebut with that earlier incident. And so that issue cut both ways. And I took — I made a legal decision as an experienced criminal defense attorney that I felt that it was more aggravating than mitigating.

I thought that if the jury found out that he was the victim of a shooting by a police officer and that that would hurt us greatly. I thought that that would — my view of that and that incident was, was that would've been devastating to us and to our case and that any chance that we had of any type of success whatsoever would've been gone.

Q:  So as to having the jury hear any of that issue, that was your belief was that it would not have assisted you?

A:  It would've done just — my opinion, I felt that it would've killed us.

Q:  Okay. How about did you or your office look at or into the amount of psychotropic medication and pain — other medications that Mr. Richmond was taking from 1998 to 2005 due to the injuries he sustained as a result of that shooting?

A:  I knew that he was on pain medication. That I knew. I gave that very little weight in terms of the mental — in terms of his mental health. Understand that I'm having to deal with him and I'm dealing with him a lot. And the issue for me and for the court is, was the issue of — is he competent to stand trial or do I — am I going to enter an insanity plea. And for both, the answers keep coming back, and kept coming back even after trial — because understand if there was any kind of diminished capacity, I would've raised that at sentencing as mitigating — there was no evidence. Nor was there any evidence that I was able to gather that would support any argument that this man, Mr. Richmond, was either incompetent, had a diminished capacity, or was insane, either at any time before the offense or at the time of the offense, or after the offense.

Q:  Let me ask you, do you have any independent recollection in your multiple contacts with him and visiting the jail that Mr.

Richmond was presenting at the jail as pacing, or not sleeping, or not eating, or crying, and that these were observations independently made by deputies who were monitoring him?

A:  The first three you mentioned, I was aware of. The crying, this is the first I've heard of that. I knew about — understand though, a lot of the — jails — he's looking at life in prison. All of that is very understandable. I would be pacing too. I would have anxiety.

The crying, this is the first I've heard. Although that wouldn't affect my opinion any. I understand all that.

Q:  And you understood that despite the fact that he was on medications — psychotropic medications — so that was understandable to you?

A:  I know — if memory serves, that he was suffering from depression. But again, that, the issue of his competency to stand trial — you know, Mr. Richmond understood who the judge was, who I was, who the State Attorney was. He appreciated the nature and the level of the charges. He was able to assist me in his own defense. He was a difficult [client], mind you, but most are. But he's very intelligent, articulate. He, you know, he — to me, there was no indication of a lack of competency.

Q:  Can you specifically tell me what the specifics his family talked to you about?

A:  No, I can't get into specifics. I do — all I recall is the fact that a conversation did take place, that the family was very concerned about his mental health. Clearly, the offense itself and the nature of what the State was alleging, is a very large indicator that there was something wrong. As you sit there and as I sit here, I would agree with you that there are plenty of elements out there that would suggest that this is a man who has some problems.

And as I took the steps to discover whether or not that competency or sanity was an issue, I wasn't getting the information necessary to be able to say to the court that this man's incompetent or lacked sanity, legally.

Q:  That was your assessment?

A:  Yes, ma'am.

Richmond testified at the evidentiary hearing that he had spent time in a mental health facility as a teenager.  (Respondent's Exhibit 22, transcript of the September 7, 2010 Rule 3.850 evidentiary hearing, pp. 55–56)  Richmond testified that as a result of being shot by a police officer in 1998 he began taking multiple medications for pain and post-traumatic stress disorder.  (Respondent's Exhibit 22, transcript of September 7, 2010 Rule 3.850 evidentiary hearing, pp. 59–60)  In 2004 at the time of the crimes Richmond was simultaneously taking Xanax, Temazapam, Elavil, Vicodin. Soma, and Darvocet.  (Respondent's Exhibit 22, transcript of September 7, 2010, Rule 3.850 evidentiary hearing, p. 64)  Richmond testified that he told counsel about both his mental health history and the medication he was taking when the crimes occurred (Respondent's Exhibit 22, transcript of the September 7, 2010 Rule 3.850 evidentiary hearing, pp. 67–69, 71–72):

> Q: Okay. Now when you were seeing him and you talked to [counsel] about your case, did you — did he ask you questions about your history and your mental health history or anything along those lines?
>
> A: No.
>
> Q: Did you tell him about your past?
>
> A: I told him about the shooting and I told him that I was having a hard time in the county jail and I — if he could get in touch with my wife or my mom.
>
> Q: Oh, when you say you were having a hard time in the county jail, could you be more specific as to what you told him?
>
> A: I was in a lot of pain because of my sciatic nerve damage and being in the facility around all those officers. And with the shooting, I was shot by a Hillsborough County officer,

everybody reminded me of the officer who shot me and it was hard dealing with all that.

Q: Were you taking any medication at that point when you were at the jail?

A: No, ma'am.

Q: And what —

A: Except once when I first came in, I wasn't on any meds because I couldn't get the meds from them that I had on the street from my doctors.

Q: Okay. Why — the jail wouldn't let you have them?

A: No, ma'am, not those same meds. They put me on some other stuff.

Q: So how long — what were they giving you at the jail?

A: They gave me Thorazine, Vistaril, and Prozac.

Q: And what was that all for?

A: For my anxiety. My post-traumatic stress syndrome.

Q: Okay. Did they give you anything for your pain?

A: All they could give me was Tylenol.

Q: They couldn't give you any of the narcotics you were taking?

A: No, ma'am.

Q: Did you — how long did you go without taking medication while you were at the jail?

A: (There was no audible response.)

Q: They start giving it to you right away or did it take awhile?

A: I can't be [spe]cific, but it — maybe a week or two.

Q: Okay. And did you relay this information to [counsel]?

A: He kn[e]w, yes, ma'am. I told him.

. . . .

Q: Do you recall at any time before this case went to trial, before a jury was picked, anyone from the . . . Public Defender's office coming to see you to evaluate you in any way?

A: No, ma'am.

Q: Anybody from social services?

A: No, ma'am.

Q: During the time that you were in the — at the jail pending these charges, could you tell me who from the public defender's office ever went to see you, other than [counsel]?

A: Nobody.

Q: You remember meeting with Dr. Carpenter, correct?

A: For sentencing, yes, ma'am.

Q: Okay. And you said for sentencing, so that was after the jury came back?

A: Yes, ma'am.

Q: But you never met with anyone before that?

A: No, ma'am.

Q: Now in reviewing your jail records, you did have contact with the jail in there and them touching base with you regarding your — you would put in for assistance for them, oh, when you needed to see a nurse, when you needed to see a doctor, would you not?

A: Yes, ma'am.

Q: Okay. And that's documented there. Can you give me some more detail as to the kind of behaviors that you were exhibiting at the jail while you were there pending charges?

A: I couldn't sleep. I couldn't eat.

Q: What would you do with your food when you didn't eat it?

A: I just — I didn't even get the food. I just didn't get up to get it. I just sat on my bunk.

Q: Did the deputies there realize that?

A: Yes, ma'am.

Q: Okay. Did you pace? Did you — were you crying?

A: Yes, ma'am. I was paranoid and I was depressed.

Q: Now had you ever been to the jail before?

. . . .

A: Yes, ma'am.

Q: So this wasn't — did this have anything to do with the fact that it was a new thing and you were being charged with attempted murder well, attempted first degree murder?

A: It had to do with the fact that I didn't have my medication.

The state post-conviction court denied Richmond's claim of ineffective assistance of counsel after the evidentiary hearing (Respondent's Exhibit 22, pp. 11–12) (court's record citations omitted):

> Defendant alleges counsel was ineffective for failing to investigate his competency. Defendant states he was incompetent due to being on prescription medicines that included Paxil, Elavil, Xanax, Soma, and Vicodin. He states those medications adversely affected his memory, cognitive reasoning skills, and caused extreme drowsiness. He states that the jail's mental health personnel had diagnosed Defendant as being delusional and suffering from insomnia. Defendant asserts that counsel should have requested a competency hearing.
>
> At the evidentiary hearing, Defendant testified that when he went to jail, he was not getting same the medication as he had

been taking prior to going to jail. He stated that jail officers gave him Thorazine, Vistaril, and Prozac for his anxiety and post-traumatic stress syndrome. He testified that it took approximately one to two weeks before he started receiving medication in jail. Defendant further testified that he suffers from sciatic nerve damage but that he could not take narcotics in jail for the pain and could only get Tylenol.

At the evidentiary hearing, [counsel] testified that he remembered Defendant to be suffering from depression, but that as to competency to stand trial, "Mr. Richmond understood who the judge was, who I was, who the State Attorney was." [Counsel] testified that Defendant was "intelligent, articulate" and that "there was no indication of a lack of competency." He testified that Defendant's family was concerned with Defendant's mental health but that as he "took the steps to discover whether or not that competency or sanity was an issue, I wasn't getting the information necessary to be able to say to the court that this man's incompetent or lacked sanity, legally."

[Counsel] testified that he twice had Defendant checked out for mental health issues and that "[i]n my own dealings with him and in the reports I was getting from our social workers, he did not — he clearly was competent to stand trial and he didn't present to me an insanity defense." He testified that he would have been aware of any medications being taken by Defendant through the social worker's reports. He testified that he was aware of Defendant's mental health history through speaking with Defendant's family. He further testified that he was aware that Defendant was pacing, not sleeping, and not eating while in jail but that he found these actions "very understandable" as Defendant was facing life in prison. [Counsel] testified that with full knowledge of Defendant's past history, he had no doubt that Defendant was competent to stand trial.

The Court finds [counsel]'s testimony credible that he found no indication Defendant was incompetent to stand trial. [Counsel] testified that he was aware of Defendant's mental health history, had met with Defendant's family, and twice had sent a social worker from his office to meet with Defendant. He testified that he had full knowledge of Defendant's history but did not see any indication that Defendant was incompetent. Accordingly, Defendant is not entitled to any relief on [this] ground . . . .

In denying relief on this ground of ineffective assistance of trial counsel the state post-conviction court found counsel's testimony more credible than Richmond's testimony. The state court's credibility determination is presumed correct. *See Baldwin v. Johnson*, 152 F.3d 1304, 1316 (11th Cir. 1998) ("We must accept the state court's credibility determination and thus credit [the attorney's] testimony over" the petitioner's.), *cert. denied*, 526 U.S. 1047 (1999); *Devier v. Zant*, 3 F.3d 1445, 1456 (11th Cir. 1993) ("Findings by the state court concerning historical facts and assessments of witness credibility are . . . entitled to the same presumption accorded findings of fact under 28 U.S.C. § 2254(d)."), *cert. denied*, 513 U.S. 1161 (1995). Relying only upon his unsupported contention, Richmond fails to overcome the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Alternatively, a merits review affords Richmond no relief. A defendant is competent to stand trial if he possesses: (1) sufficient present ability to consult with his attorney with a reasonable degree of rational understanding, and (2) a rational and factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402 (1960); Fla. R. Crim. P. 3.211(a)(1). Evidence of low intelligence, mental deficiency, or the use of anti-psychotic drugs is insufficient to show incompetence to stand trial. *Pardo v. Sec'y, Fla. Dep't of Corr.*, 587 F.3d 1093, 1101 (11th Cir. 2009) (citing *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995)). "A bare allegation of the level of psychotropic drugs administered to [a] petitioner before

[proceeding to trial] . . . is insufficient to meet this evidentiary threshold." *Sheley v. Singletary*, 955 F.2d 1434, 1439 (11th Cir. 1992).

Richmond presents no evidence demonstrating that either a mental illness or a psychotropic medication affected him to the point that he could not understand the proceedings or effectively consult with counsel. *Dusky*, 362 U .S. at 402. The trial transcript shows that Richmond disclosed to the trial judge that he was taking Prozac during the trial but understood the proceedings and counsel confirmed his belief that Richmond understood the proceedings.[5] Richmond voluntarily testified at trial in a

---

[5] The trial judge inquired of Richmond about his decision to testify (Respondent's Exhibit 1, Vol. IV, pp. 372–74):

> Court:  Okay. You understand, Mr. Richmond, that it's your decision and yours alone as to whether you wish to testify before this jury? I cannot force you to testify or not testify. [Counsel] can't force you to testify or not testify. It's all up to you. You understand that?

> [Richmond]:  Yes, ma'am.

> Court:  Then you have had the benefit of [counsel]'s advice. I don't want to know what it is but you have had a chance to talk with him, correct?

> [Richmond]:  Yes, ma'am.

> Court:  All right. Are you taking any drugs or medicine today?

> [Richmond]:  Early this morning but I'm okay.

> Court:  Okay. Well, tell me what it is you took.

> [Richmond]:  Prozac.

> Court:  Prozac. And you have been taking that for how long?

> [Richmond]:  Since I've been in the Hillsborough County jail system.

> Court:  And how long has that been approximately?

(continued...)

rational and coherent manner.  Based on the record reasonable counsel could have decided against seeking a competency hearing or further investigating Richmond's mental health.

Even assuming that counsel performed deficiently by not investigating Richmond's competency, Richmond cannot establish resulting prejudice.  "In order to demonstrate prejudice from counsel's failure to investigate his competency, [a] petitioner has to show that there exists 'at least a reasonable probability that a

---

[5](...continued)
[Richmond]:  Going on six months, ma'am.

Court:  But that medicine just sort of calms you down.  It doesn't confuse you?

[Richmond]:  I'm okay. Yes, ma'am. I understand everything.

Court:  That's exactly where I was going. [Counsel], you have been representing the defendant for a period of time now, is that correct?

[Counsel]:  I have, actually, Your Honor. Almost five months.

Court:  Okay. And he's been on Prozac since then. So my question to you is, do you have any reason to believe that because of the Prozac or anything else that might be in his system he does not understand what's happening?

[Counsel]:  No. To the contrary, Your Honor, I find him to be completely competent. I've even looked into the issue prior to trial and I've even had people smarter than me to advise me that he's competent.

Court:  So the question is, [counsel] has indicated that you or indicated to me rather, that you wish to testify. Is that correct?

[Richmond]:  Yes, ma'am.

Court:  Fine. Then I'm going to find — and you are satisfied with what [counsel] has done on your behalf so far?

[Richmond]:  Yes, ma'am. He's done a great job.

psychological evaluation would have revealed that he was incompetent to stand trial.'" *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989) (quoting *Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir. 1988)).  Richmond fails to satisfy this burden. Consequently, his claim of ineffective assistance of counsel warrants no relief because he fails to establish either that the state court unreasonably applied *Strickland* or unreasonably determined the facts in rejecting this claim.  28 U.S.C. § 2254(d)(1), (2).

Accordingly, Richmond's application for the writ of habeas corpus (Doc. 1) is **DENIED**.  The clerk must enter a judgment against Richmond and close this action.

### DENIAL OF BOTH A CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Richmond is not entitled to a certificate of appealability ("COA").  A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition.  28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a COA.  Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  To merit a COA, Richmond must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise.  *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001).  Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Richmond is entitled to neither a certificate of appealability nor an appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**.  Leave to appeal *in forma pauperis* is **DENIED**.  Richmond must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on July 11, 2016.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE